[Filed March 25, 1889.]

## WRIGHT, APPELLANT, *v.* SHINDLER, RESPONDENT.

RIGHT TO MAINTAIN DAM — EFFECT OF DEEDS. — The effect of the deeds offered in evidence was to vest in the defendants the right to keep and maintain a dam ten feet high above low-water mark at the place described, on Johnson's Creek, in Multnomah County.

CASE ADJUDGED. — An examination of the evidence leads to the conclusion that the present dam, maintained by the defendants on Johnson's Creek, is of the same height as a former dam; that the defendants and those under whom they claim had not destroyed or changed the land-marks, and that the maintenance of the dam by defendants is not wrongful, and that plaintiff's land is subject to whatever flowage a dam ten feet high at low-water mark at the point described may produce or cause.

APPEAL from Multnomah County.

*R. H. Thornton,* for Appellants.

*R. & E. B. Williams,* for Respondent.

Strahan, J. — The object of this suit is to enjoin the defendants from maintaining a certain mill-dam at a height which causes the plaintiff's land to be overflowed, and also to recover damages caused by such flooding. Prior to 1866, Jacob Wills owned two parcels of land on Johnson's Creek, at Willsburg, in Multnomah County. In the year last named, he deeded one parcel to Lewelling and Baird, their heirs and assigns, with the right to keep and maintain a dam across Johnson's Creek ten feet high above low-water mark, at the site of the old mill on said premises known as Wills's mill. In 1879, Lewelling and Baird conveyed the same premises to the defendants, with the same rights as to maintaining the dam across Johnson's Creek. In 1870, Jacob Wills conveyed the other parcel of land, which was above and adjacent to the tract then owned by the defendants, to E. P. Wright, one of the plaintiffs.

In 1875, Wright conveyed to Jane Glass, who, in 1883, reconveyed to Wright, who, in 1885, conveyed the same premises to Delia, his wife. In March, 1883, the dam which had previously existed on said stream at said point was carried away by a flood. In the summer of 1883, the defendants rebuilt said dam at the same place. The plaintiffs allege that respondents erected said dam in 1883, fourteen inches higher than the one which had previously existed there.

The respondents denied that said dam was any higher than the old dam at the same place; and the referee found "that the said dam, rebuilt as aforesaid by defendants herein during the said year of 1883, was so built ten feet high above low-water mark at the site of said old mill, and no higher, and at the time of the filing of the complaint herein said dam was being maintained by said defendants at said height, and no higher."

While the old dam existed, and while Jane Glass held

the title to the land, she instituted an action against the defendants to recover damages to her land caused by the old dam. In that action, the plaintiff alleged that the defendants had raised their dam to the height of eleven feet above low-water mark at the site of the old mill. The jury found that the dam, on the twenty-seventh day of September, 1877, when the action was commenced, was only ten feet high, and found for the defendants generally.

In 1874, while E. P. Wright held the legal title to said premises, he prosecuted a like action against the defendants, with the same result.

The present owner of the premises being in privity with Jane Glass and E. P. Wright, the defendants have pleaded each of said judgments as an estoppel against the plaintiffs, and as a bar against the prosecution of this suit; but it is not necessary to consider or pass upon the questions presented by those adjudications, for the reasons that the right of the defendants to maintain said dam in its present condition was not and could not have been litigated or determined in either of those cases, because it had not then been constructed.

If the question whether the defendant might lawfully maintain any dam whatever on said premises were involved here, or if the question were presented whether the defendants might lawfully maintain the same dam that existed at the time of the former litigation, then it is conceived that the judgments relied upon as estoppels would be of a conclusive nature upon the question litigated; they did settle conclusively and finally between the parties and their privies the questions litigated in those cases.

The course of the appellants' argument concedes these propositions; but their contention is, that the respondents, having the right to maintain a dam at the place named, have rebuilt it and carried it to a higher point

than the previous dam, and higher than they were authorized to do under the deed conferring the right. This reduces the controversy to one of fact, and requires a brief examination of the evidence.

1. The defendants, by virtue of the deeds offered in evidence, had the right to erect and maintain a dam at the place mentioned, ten feet high above low-water mark, and the only question is, whether this dam exceeds that height. The plaintiffs seek to maintain the affirmative of this question by referring to the testimony concerning,—1. The number of abutment logs visible above the dam; 2. A survey made by Messrs. Hurlburt and Ogilbie; 3. Spikes said to have been driven by Mr. Burrage, a surveyor; 4. The water line on the abutment logs; 5. A private stake on appellants' land; 6. The condition of that land before and after the dam of 1883 was built.

But none of the points, nor all of them together, clearly or satisfactorily sustain the plaintiffs' contention. Some of them have a bearing argument actively favorable to the plaintiff; others, when carefully examined in the light of the evidence, support the respondents' contention, to which a more particular reference will be made presently.

It is difficult to see how the parties could make so serious a controversy out of a fact that would seem to be susceptible of clear proof by actual measurement of the height of the dam. When its height is correctly ascertained, the controversy is practically at an end.

John E. Frick, a witness for respondents, says that he was in their employ from August, 1881, to April 10, 1886, as foreman and superintendent of the factory. Had charge of the dam during the time. It went out in March, 1883, all except the abutments. Respondents rebuilt it under supervision of witness. In rebuilding, nothing was done to the abutments, except to relay the top layer of timber twelve by twelve. The

spikes were in the abutment during the time the old dam stood,—saw them driven. They were in the abutments during the whole time he worked in the factory. Saw them last in June last. They appeared as they formerly did, only more rusty, and the wood around them more decayed than it had been. When he last saw them, they appeared to be in the same position as when first seen. He had some difficulty in finding the spikes in the east abutment at the time he saw it last. The nail was in a decayed hole, and partly rusted away. About one inch of the nail was rusted away. Those spikes remained in the same position and were not removed during the time witness worked for respondents. They were on a level with the old dam. The dam built in 1883 was the same height as the old dam. There was no difference.

Seth Lewelling, another witness for the respondents, testified, in substance: "I think I built the dam that washed out in 1873 or 1874. Mr. Burrage made a survey at two different times. The first time, I did not take any marks, so that I had an idea when the survey came. The second time, he set his compass and gave me the height,—ten feet,—and drove spikes, one in each abutment, at the end of the dam. I drove the spikes a few inches from the planking, up the creek. The first survey was during the litigation with Wright; the second, while litigating with Jane Glass. Ten or twelve were there when the spikes were driven. Jake Wills was there. I drove the spikes; held the spike against the abutment, Burrage took sight, then I drove it in so that the head would just show. Jacob Wills and Edward Long were there. They were the principal men in building the abutment in the first place, and that is the reason they were chosen to examine it. I think the spikes were never changed. I found them where I was satisfied they were correct, some time after I had sold it. I examined the spikes after I

heard of this lawsuit.  I found one of them; the other one had been broken off by a drift or something at some time, but I could feel the piece that had been broken off in the hole with my knife.  The west spike was plain.  I believe they were in the same location at that time (after this suit was commenced) as first driven, as I found them without any trouble at all, from memory.  Mr. Wright was there at that time.  Don't think the present dam does any injury to the place of Mr. Wright more than the dam of 1877.  Don't think the water is raised any higher. Don't see how it could."

This witness was recalled after having again examined the dam, and said, in substance, that he found both spikes as originally driven, and that he was satisfied they had not been removed; that they were in the same place; that the height of the present dam is the same as the old one, and that the present dam is not quite as high as the spikes.

Jacob Wills was also called by respondents, and testified, in substance: "Was present when Burrage made the survey in 1877 or 1878.  Saw the spikes driven.  Myself and Mr. Long established the low-water mark, the base from which he (Burrage) leveled the top of the dam.  Knew where the low-water mark was at the site of Wills's old mill, which was standing.  We established low-water mark by putting a block on the cross-timbers five inches thick, which represented a sawed apron two inches thick, which went up and down the stream, and also three inches depth of water of the natural flow at low water.  The top of the block represented low-water mark at the site of Wills's old mill.  Burrage took the level ten feet high from the top of this block at the time the spikes were driven.  Between the survey made by Burrage in 1877 and the survey in 1887, the apron was covered with gravel and sawdust of varied thickness.  By working away of the dam a portion

of the foundation had been washed away when the survey was made in 1887. The apron was covered with this sawdust and sand, and when you dug down the water came up over it. The apron was nearly all gone and covered up. The apron was built in 1848. I have lived about a quarter of a mile from the dam for a quarter of a century, and have been familiar with the premises all that time. The old dam was a little below the level of the spikes, — a small fraction. The old dam and the present one were about the same height. Mr. Lewelling drove the spikes at the time of the Burrage survey. I have seen the spikes frequently since they were driven; saw them last day before yesterday; don't think they have been moved. The measurement made by Mr. Hurlburt and Ogilbie was not from the same base as the Burrage survey."

G. Shindler, one of the defendants, testified, in substance: "Bought the property in 1878 or 1879. Have seen the dam a good many times; you know it was blown out; it went out like a thunder-clap. John Frick was our foreman the night the dam went out. The abutments were the only thing left. No change has been made in the abutments except to remove the top logs, which were rotten, and put on new ones. I was shown the spikes after I bought. They are in the same place now they were then. I do not know of their being changed. I had the new dam built and had supervision of it; I do not think there is a particle of difference in the height of the present dam and the one that was washed out in 1883. I have visited the place a great many times since the dam was built. I was perfectly familiar with the old one. I saw these spikes two or three weeks ago. The spikes were there June 9, 1886, and have never been changed; the spike on the west side is perfectly plain; the one on the east side is broken off and rusty."

Job Williams also testified in behalf of the respondents;

in substance: "Have known the premises for fifteen or sixteen years. Was familiar with the dam that went out in 1883. I helped rebuild the dam from the ground up. John Frick superintended the work. When we rebuilt the dam, the marks of the old dam were on the abutments and the spike. We went by this. The spikes were in the abutments that held a three-inch plank that ran up and down; that left a mark on that abutment to show how high the old dam had been. Now, in that abutment, there is a spike driven by a surveyor; we also had that to go by, so as not to get the gates of the dam too high. The old dam and the spike driven by the surveyor were the same height. There were two spikes driven by the surveyor, or one in each abutment. The spike in the west abutment was there when we rebuilt the dam in 1883; the head of the other was broken off, but the stub was in the wood. The height of the present dam compares with the one that was washed out in 1883 just as nigh as we could build it."

On the other hand, Mr. Wright and Mr. Clark, Jane Glass, and perhaps another, testify to seeing *new spikes* that had been driven into the abutments from eight to ten inches above where the Burrage spikes were driven, and the inference sought to be drawn from this is, that some interested party must have tampered with the Burrage spikes for some improper purpose. I do not think this evidence has sufficient strength and force to overcome the evidence offered on the subject of the spikes by the defendants. Wright and Miss Glass have both been taking part in this litigation for years, and from their situation and surroundings, their feelings were liable to be deeply enlisted, and they necessarily feel great anxiety as to the result; and Clark does not appear to possess any means of knowledge superior or even equal to the defendants' witnesses. I am therefore constrained to believe

the version of the defendants' witnesses, in relation to the height of the new dam and the places where the Burrage spikes were driven, is the true one. And I think that the conclusion that the new dam is the same height as the old one is very materially fortified and strengthened by another circumstance. The plaintiff E. P. Wright and Jane Glass each, heretofore, prosecuted separate actions at different times against the defendants or their predecessors in interest to recover damages for the same land caused by the old dam backing water upon it. Their present contention is, that the new dam is higher than the old. The old dam caused the water to flow back on the plaintiff's land; the new did the same, and to, I think, no greater extent, so that the plaintiff's theory that the new dam was raised higher than the old is not sustained by the evidence. The value of the Hurlburt survey depends entirely on the question whether or not he found the true point of low-water mark. If he did not, the survey is of no value whatever.

From a careful consideration of all the evidence on that subject, I am led irresistibly to the conclusion he did not measure from the actual low-water mark named in the deeds. The actual point was difficult to determine after the lapse of time and changes that had occurred, and the fact that it differed essentially from the other measurements, made by those who had better knowledge and means of knowing, is sufficient to require us to give credit to the earlier survey and measurement instead of this one. I have been much interested in the able and exhaustive argument of appellant's counsel; but however persuasive his logic, it is overcome by a preponderance of the evidence, which must carry the case the other way. The decree of the court below must therefore be affirmed.